IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSEPH JUGAN and
ROBIN JUGAN


v.                                         C.A. NO. 15-4272


ECONOMY PREMIER ASSURANCE
COMPANY


### MEMORANDUM OPINION

SCHMEHL, J.   /s/ JLS                                    JULY 6, 2016

 Plaintiffs brought this action, claiming the defendant breached an insurance contract it had with plaintiffs when defendant refused to pay for water damage to plaintiffs' home and some of its contents. Presently before the Court is the defendant's motion for summary judgment. For the reasons that follow, the motion is granted in part and denied in part.

 Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. and N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

The parties have stipulated to the following facts:

1.  MetLife issued a Homeowners Insurance Policy to Robin Jugan and Joseph R. Jugan ("Plaintiff"), Policy no. 8355170620, effective June 30, 2014 to June 30, 2015, with respect to the property located at 58 Clemons Road, Fleetwood, Pennsylvania 19522 (the "Policy"). The Policy features dwelling limits of $373,500, contents limits of $261,450.00 and a $250 deductible. The Policy provides:

CAUSES OF PROPERTY LOSS

SECTION I-LOSSES WE COVER

(Special Perils)

*************

COVERAGE A-DWELLING AND COVERAGE B-PRIVATE

STRUCTURES

We will pay for sudden and accidental direct physical loss or
damage to the property described in Coverages A and B, except as
excluded in SECTION I-LOSSES WE DO NOT COVER
COVERAGE C-PERSONAL PROPERTY
We will pay for sudden and accidental direct physical loss or

damage to the property described in Coverages C when loss or damage is caused by SECTION I-BROAD NAMED PERILS, except as excluded in SECTION I-LOSSES WE DO NOT COVER.

2. With respect to Coverage C, the Policy provides the following grant of coverage for freezing, with a coverage exclusion for an unoccupied premises, and a subsequent exception to the exclusion if Plaintiff used reasonable care to maintain heat or shut off and drain the water supply:

SECTION I-BROAD NAMED PERILS

Whenever Broad Named Perils is referred to in this policy, the following causes of loss will apply for sudden and accidental direct physical loss.

*************

14.  Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a domestic appliance.
We do not pay for loss on the residence premises while the dwelling is unoccupied, unless you have used reasonable care to maintain heat in the building or have shut off the water supply and drained the water from all plumbing and appliances. However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply. For this provision, a plumbing system or domestic appliance does not include a roof drain, gutter, downspout, or similar fixtures or equipment.

3. The policy does not define the term "unoccupied."

4. With respect to Coverages A and B, the Policy provides the following "Absolute Freezing Exclusion" and a subsequent exception to the exclusion if Plaintiff use reasonable care to maintain heat or shut off and drain the water supply:

SECTION I-LOSSES WE DO NOT COVER

3

\*\*\*\*\*\*\*\*\*\*\*\*\*

3. We do not cover loss or damage to the property described
in Coverage A and Coverage B which results directly
 or indirectly from any of the following:
\*\*\*\*\*\*\*\*\*\*\*\*\*

G. freezing of a plumbing, heating, air conditioning, or
automatic fire protection sprinkler system, or of a domestic
appliance, or by discharge, leakage or overflow from within
the system or appliance caused by freezing. This exclusion
does not apply if you have used reasonable care to maintain
heat in the building or if you shut off the water supply and
drained the plumbing and appliance of water. However, if
the building is protected by an automatic fire protective
sprinkler system, you must use reasonable care to continue
the water supply and maintain heat in the building for
coverage to apply.
For this provision, a plumbing system or domestic
appliance does not include a roof drain, gutter, downspout,
or similar fixtures or equipment;

5. The Absolute Freezing Exclusion operates independent of any occupancy

requirements, unlike the provisions found in Coverage C.

6. The house is located at 58 Clemens Road in Fleetwood, Pennsylvania.

7. Plaintiffs had the house built and moved into it in July 1994.

8. The house has a single story with a walk-out basement beneath.

9. The "walk-out" portion of the basement is at the rear of the house and is above ground.

10. The other sides of the basement have earth around them.

11. On the first story, the kitchen is located toward the rear of the house, above the

"walk-out" side of the basement.

12. In the kitchen, there is a dishwasher located against the rear wall of the house.

13. The hot and cold water lines that supply the dishwasher are located on the ceiling of

the basement aside the rear exterior wall of the house.

4

14. With respect to the hot and cold dishwasher supply lines, Plaintiff testified: "Well, I'm not a hundred present sure, but I believe that we had insulation, insulated the hot water going into the---and the cold water because what we would get is condensation on the pipes."

15. At the time of the loss, there were two thermostats in the house.

16. A digital thermostat was located on the first floor of the house in the hallway at the center of the house, and approximately 20-25 feet from the kitchen. It controlled the forced hot air system that supplies heat to the first floor of the house.

17. An analog thermostat is located in the basement of the house on an interior wall. The basement thermostat controlled two radiators located in the basement. One radiator is in a bathroom and the other is located in the area below the master bedroom.

18. There are no radiators in the basement below the kitchen, and the only heat source in that area of the basement below the kitchen is a wood-burning stove that was not used by the Jugans.

19. The basement was unfinished and without heat for the first three years and during that time the water in the pipes did not freeze.

20. Plaintiff Mr. Jugan has been disabled since 1997 with a brain tumor.

21. Since 1994, Mr. Jugan has taken prescription narcotics to treat the pain from the tumor.

22. Mr. Jugan's brain tumor and narcotic medication causes forgetfulness, loss of memory, and failure to recall events.

23. Mr. Jugan's brain tumor and the narcotics he takes to treat it make it difficult for him to complete jobs and to remember where he leaves things.

24. Mrs. Jugan moved to Massachusetts in 2009 and did not live in the house after that

time.

25. Mr. Jugan often traveled to Massachusetts after 2009 to visit his wife and children.

26. Mr. Jugan's mother was diagnosed with cancer in 2003.

27. Between 2009 and 2013, Mr. Jugan's mother underwent chemotherapy once every three weeks.

28. During that period, Mr. Jugan would travel to New Jersey for several days to assist his mother almost every time his mother underwent chemotherapy.

29. Between the times he assisted his mother in New Jersey, Mr. Jugan traveled to Massachusetts for several days at a time.

30. Mr. Jugan was away from the house for as long as "a few weeks, couple of weeks" at a time during the period between 2009 and 2013.

31. During Summer 2014, Mr. Jugan listed the house for sale.

32. Certain personal items were removed from the house while the house was for sale.

33. Mr. Jugan had the house's heating and air conditioning system serviced during Summer 2014 [in] an effort to prepare the house for sale.

34. The heating and air conditioning contractor who serviced the system during Summer 2014 replaced the radiators in the basement.

35. Mr. Jugan wanted to test the radiators while he was present at the house to make sure they were properly installed and did not leak.

36. With respect to the basement radiator system, Mr. Jugan stated that he "did not want to turn it on until I could be there at the house—with it running."

37. Mr. Jugan never tested the new radiators to ensure they were not leaking prior to the loss.

38. Mr. Jugan's plan to sell the house during Summer 2014 was interrupted by his mother's urgent medical condition.

39. In October 2014, Mr. Jugan's mother became terminally ill and Mr. Jugan began to spend most of his time in New Jersey attending to her.

40. Mr. Jugan testified that when he left the house to go to New Jersey in October 2014, he did not set the thermostat at any particular temperature.

41. Mr. Jugan's mother died on January 1, 2015.

42. Between January 1, 2015 and February 1, 2015, Mr. Jugan spent approximately three to five days in the house, and spent the remainder of his time in New Jersey and Massachusetts.

43. The last time Mr. Jugan was in the house before the loss was February 1, 2015.

44. On February 1, 2015, Mr. Jugan went to the house for 1-2 hours.

45. The sole purpose of Mr. Jugan's visit to the house on February 1, 2015 was to find leftover prescription pain medication because his regular prescription was interrupted.

46. Mr. Jugan was "very much in withdrawal" from his prescription pain medication during the visit, and his recollection of the events of the visit is "kind of a haze."

47. Mr. Jugan does not remember adjusting the digital thermostat on the main floor of the house while he was there on February 1, 2015.

48. Mr. Jugan could not definitively state whether the thermostat on the main floor was set at 62 degrees before he left the house on February 1, 2015.

49. Mr. Jugan does not remember adjusting the analog thermostat in the basement of the house while he was there on February 1, 2015.

50. Mr. Jugan does not remember the temperature at which the basement analog thermostat was set at the time of the loss. He explained that it was "just the way it was from

when it was worked on" in Summer 2014.

51. Mr. Jugan traveled to Massachusetts after leaving the house on February 1, 2015.

52. Mr. Jugan acknowledged that the temperature in Massachusetts between February 1, 2015 and March 13, 2015 reached below zero.

53. While he was in Massachusetts, Mr. Jugan watched weather reports for the area in which the house was located.

54. Mr. Jugan understood that the weather in Pennsylvania was "cold and snowy" just like it was [in Massachusetts.]"

55. Mr. Jugan testified that his neighbors in Fleetwood had access to a key to the house.

56. Mr. Jugan had the phone numbers of the neighbors and could call them to ask them to check on the house.

57. Mr. Jugan had his neighbors check on the house in the past while he was away.

58. Mr. and Mrs. Jugan made a one-day trip to Pennsylvania on February 13, 2015 to obtain Mr. Jugan's renewed prescription.

59. During the February 13, 2015 trip, Mr. and Mrs. Jugan did not stop at the house.

60. Mr. Jugan and Mrs. Jugan arrived at the house on the night of March 13, 2015 and discovered water running from the dishwasher.

61. Upon discovering the running water, Mr. Jugan shut off the water supply to the house.

62. Mr. and Mrs. Jugan left the house and returned to New Jersey that night.

63. Mr. Jugan contacted MetLife to report the loss the next morning.

64. Mr. Jugan does not remember whether he told MetLife the temperature at which he set the basement thermostat.

65. Mr. Jugan remembers telling a representative of MetLife that he could not recall the temperature at which the thermostat was set.

66. On March 13, 2015, MetLife acknowledged Plaintiffs' claim by letter.

67. On March 24, 2015, MetLife acknowledged that Plaintiffs' claim involved mold, and that investigation would be necessary to identify the source of the mold.

68. On March 27, 2015, MetLife wrote a reservation of rights letter to Plaintiffs informing them of a potential coverage problem with respect to the claim relative to the freezing exclusion of the MetLife policy.

69. On May 4, 2015, MetLife denied coverage on the claim by letter.
(ECF 12-5.)

Defendant has submitted the following facts which it claims that plaintiff would not stipulate to, but nevertheless are supported in the record. The Court concurs that these facts are supported in the record.

1. Plaintiff testified that for most of December 2013 through April 2014, he stayed with his wife and family in Massachusetts. (ECF 12-7, pp.16-18.)

2. Plaintiff testified that in April 2014, he returned to the house and lived there until October 2014. (Id. at 18.)

3. Plaintiff testified that he did not ask his neighbors to check on the house between February 1, 2015 and March 13, 2015. (Id. at 102.). He did not call his neighbors because he "didn't have any reason to believe anything was wrong." (Id. at 103.)

4. MetLife retained Rimkus Consulting Group to perform an energy usage audit to determine if adequate heat was maintained in the property in February 2015 and March 2015. (ECF 12-9).

5.   On May 1, 2015, Charles S. Fleishman, B.M.S.E., P.E. issued a report on the cause of the loss. (<u>Id</u>.)

6.   Mr. Fleishman's report was based on an investigation by others, a personal inspection of the subject property, submitted invoices for fuel oil and electric usage, weather records and an interview of Plaintiff Mr. Jugan. (<u>Id</u>.)

7.   In his report, Mr. Fleishman noted that an investigation by others revealed that the "damage was due to a frozen dishwasher solenoid valve." (<u>Id</u>.)

8.   Mr. Fleishman also noted that the outside temperatures in the area during February 2015 were "adequate to cause piping system freezes." (<u>Id</u>.)

9.   Mr. Fleishman made the following conclusions:

- "The failure of the dishwasher solenoid valve was from water freezing in the water supply line to the dishwasher."

- "There was insufficient heat within the property to prevent water from freezing."

- "From the provided fuel oil records, the insufficient heat in the property was attributed to the thermostat for the hot water baseboard heat was [sic] set too low in the unoccupied house."

- "Data from submitted records showed that fuel oil was not being constantly supplied to the property, and that the fuel oil tanks were found empty during the recent inspection of April 14, 2015.

- "There did not appear to be any mechanical failures of the heating systems, but further testing would be needed to confirm that after plumbing repairs and refueling."

- The fuel oil tanks ran dry because the dishwasher valve leaked hot water, and the

boiler kept heating the leaking hot water, which consumed all of the fuel oil."

- "The estimated date of the freeze occurred on February 16, 2015, with an estimated thaw date of February 22, 2015." (Id.)

10. MetLife investigated the circumstances of the loss. (ECF 12-9, 12-11, 12-12, 12-13, 12-14.)

11. The Court also notes that a table appended to Mr. Fleishman's report lists the temperatures in nearby Reading, Pa. from February 15, 2015 through February 20, 2015 as never exceeding 29 degrees Fahrenheit during the day and ranging from 8 degrees to minus 1 degree (on two occasions) at night. (ECF 12-9.)

Following the close of discovery and after defendant submitted its motion for summary judgment, plaintiffs filed an affidavit consisting of 37 averments which they contend raise genuine issues of material fact and prevent the Court from granting defendant's motion for summary judgment. Indeed, in opposing defendant's motion for summary judgment, plaintiffs do not make a single citation to Mr. Jugan's depositon testimony, but rely instead entirely on Mr. Jugan's affidavit. Defendant urges the Court to disregard the entire affidavit because the contents therein conflict with plaintiff's deposition testimony, resulting in a sham affidavit.

"A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment." Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007). The sham affidavit doctrine is based on the theory that "prior depositions are more reliable than affidavits." Id.

In Jiminez, our Court of Appeals recognized that other courts of appeals have "adopted a particularly robust version of the sham affidavit doctrine, holding that, whenever a subsequent

affidavit contradicts prior deposition testimony, it should be disregarded." Id. at 254. The Third

Circuit has "adopted a more flexible approach." Id. The Third Circuit recognized in Jiminez that

"not all contradictory affidavits are necessarily shams." Id. Notably, "'[w]hen there is

independent evidence in the record to bolster an otherwise questionable affidavit, courts have

generally refused to disregard the affidavit.'" Id. (quoting Baer v. Chase, 392 F. 3d 609, 625 (3d

Cir. 2004)). "Such corroborating evidence may establish that the affiant was `understandably'

mistaken, confused, or not in possession of all the facts during the previous deposition," and the

affiant should have the opportunity to provide a "satisfactory explanation" for the conflict

between the prior deposition and the affidavit. Id.

The Court has reviewed Mr. Jugan's affidavit and finds that certain averments should be

stricken because they conflict with his prior deposition testimony and Mr. Jugan has not

provided a satisfactory explanation or independent evidence to support the particular averments.

For example, Mr. Jugan avers, in the third person, that "[w]hen Joseph Jugan left the house on

February 1, 2015, the basement thermostat was set no lower than its low setting of 40 degrees

Fahrenheit." (ECF 16-1, ¶ 20.)  This averment contradicts Mr. Jugan's deposition testimony, to

which his counsel stipulated, that he does not remember the temperature at which the basement

analog thermostat was set at the time of the loss. (ECF  12-5, ¶ 50.)

Mr. Jugan also avers that "[w]hen Joseph Jugan traveled away from his house during the

winter of 2014-2015 he set the thermostat on the main level of his house at 62 degrees

Fahrenheit and set the thermostat in the basement at its low setting."  (ECF 16-1, ¶ 32.) This

averment contradicts Mr. Jugan's deposition testimony, to which his counsel stipulated, that Mr.

Jugan does not remember adjusting the digital thermostat on the main floor of the house while he

was there on February 1, 2015 and that Mr. Jugan could not definitively state whether the

thermostat on the main floor was set at 62 degrees before he left the house on February 1, 2015. (ECF 12-5, ¶¶ 47, 48).

Mr. Jugan also avers that "[w]hen Joseph Jugan left the house on February 1, 2015, the heat in the basement was set to turn on at no lower than 40 degrees Fahrenheit." (ECF 16-1, ¶ 35.) This averment contradicts Mr. Jugan's deposition testimony, to which his counsel stipulated, that he does not remember adjusting the analog thermostat in the basement of the house while he was there on February 1, 2015 and that Mr. Jugan does not remember the temperature at which the basement analog thermostat was set at the time of the loss. (ECF 12-5, ¶¶ 49-50.) He explained that it was "just the way it was from when it was worked on" in Summer 2014. (Id.) Therefore, the Court will disregard averments 20, 32 and 35 in Mr. Jugan's affidavit under the sham affidavit doctrine.

Mr. Jugan also avers that "[d]ue to the extensive maintenance performed by an expert third party on the heating system in Joseph Jugan's house in the fall of 2014, he believed that the basement thermostat and heating system were operational on February 1, 2015 and that if the basement temperature had fallen below the low setting on the thermostat, that the basement thermostat would have called for heat and that hot water would have been delivered to the basement radiators." (ECF 16-1, ¶ 21.) This averment contradicts Mr. Jugan's deposition testimony, to which his counsel stipulated, that he "wanted to test the radiators while he was present at the house to make sure they were properly installed and did not leak" and that he had in fact "never tested the new radiators to ensure they were not leaking prior to the loss." (ECF 12-5. ¶¶ 35, 37).  Therefore, the Court will also disregard averment 21,

The remaining averments in Mr. Jugan's affidavit essentially deal with Mr. Jugan's habits with respect to heating his home, including:

"With the exception of the six or seven times that the basement heat had been turned up for hosting company in the basement, the basement heat was never turned up from its low setting. (ECF 16-1, ¶ 22.)

"In Joseph Jugan's travel away from his home before the 2015 loss, he always left the basement thermostat set at the low setting and there was never any freezing or other problems in the basement or on the main floor of his house." (ECF 16-1, ¶ 23.)

"Although Joseph Jugan traveled in February 2015 and knew that the outside temperature was relatively cold at his house, he has both been traveling and has been present at the house while the outside temperature was similarly cold and with the same basement heat setting and there had been no freezing or other problem in the basement or on the main floor of the house." (ECF 16-1, ¶ 24.)

"Due to Joseph Jugan's nine year history of keeping the basement without heat without any loss and due to his thirteen year history of keeping the basement heat set at the low setting without any loss, when he left the house on February 1, 2015 with the basement heat set at the low setting, he had no reason to believe that catastrophic damage would occur in his house." (ECF 16-1, ¶ 25.)

"When Joseph Jugan traveled away from his house during months when heat was needed in the house, his habit was to leave the thermostat on the main level set to 62 degrees Fahrenheit and to leave the thermostat in the basement turned on and set to its low setting of 40 degrees Fahrenheit." (ECF 16-1, ¶ 31.)

"When Joseph Jugan was in the house on February 1, 2015 and when he left the house that day, the heat in the main level of the house was turned on and the house felt warm—i.e. it felt approximately 62 degrees Fahrenheit." (ECF 16-1, ¶ 33.)

"Although Mr. Jugan does not specifically recall the exact temperature setting of the thermostat on the main level of the house when he left on February 1, 2015, it was his habit to set it to 62 degrees Fahrenheit while traveling and he believes that it was set to the same when he left the house on February 1, 2015." (ECF 16-1, ¶ 34.)

Since these averments with regard to Mr. Jugan's habits with respect to heating his home do not contradict any of Mr. Jugan's deposition testimony, they will be accepted by the Court.

In the context of an insurance dispute in Pennsylvania, "the insured bears the initial burden of proving facts that bring its claim within the policy's affirmative grant of coverage." Sciolla v. W. Bend Mut. Ins. Co., 987 F. Supp. 2d 594, 599 (E.D. Pa. 2013). If the insured meets its burden of proving coverage and the insurer raises a defense based on policy exclusion, the burden of establishing the applicability of that exclusion falls to the insurer. Id. Exclusions must be construed narrowly against the insurer. Estate of O'Connell v. Progressive Ins. Co.. 79 A. 3d 1134, 1140 (Pa. Super. Ct. 2013).

Generally, where the terms of an insurance contract are clear and unambiguous, a court is obliged to enforce the plain language of the agreement. Reliance Ins. Co. v. Moessner, 121 F. 3d 895, 900-901 (3d Cir. 1997). However, where a contract provision is ambiguous in the context of the entire agreement, the questionable provision must be construed in favor of the insured. Devcon Int'l Corp. v. Reliance Ins. Co., 609 F. 3d 214, 218 (3d Cir. 2010). The determination of a provision's ambiguity is "generally performed by a court rather than by a jury." 401 Fourth Street, Inc. v. Investors Ins. Gp., 879 A. 2d 166, 171 (Pa. 2005). Moreover, this interpretative question is one of law that is properly resolved on a motion for summary judgment. Harleysville Ins. Co. v. Aetna Cas. & Sur. Ins. Co., 795 A. 2d 383, 385 (Pa. 2002).

A disagreement between the parties on the meaning of a provision of a policy does not

necessarily render the provision ambiguous. 12th Street Gym, Inc. v. Gen. Star Indem. Co., 93 F. 3d 1158, 1165 (3d Cir. 1996). Policy language "is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." Travelers Prop. Ca. Co. of Am. v. Chubb Custom Ins. Co., 864 F. Supp. 2d 301, 312 (E.D. Pa. 2012). In the case of ambiguity, a court must be careful to avoid rewriting the policy language in a way that conflicts with the plain meaning of the policy's language, even though the provision in question must be interpreted in favor of the insured. Bhd. Mut. Ins. Co. v. Salem Baptist Church of Jenkintown, 985 F. Supp. 2d 624, 632 (E.D. Pa. 2013).

Courts in Pennsylvania, noting the adhesive nature of insurance contracts, have found that some "normal contract principles" do not apply. Pressley v. Travelers Prop. Cas. Corp., 817 A. 2d 1131, 1139 (Pa. Super. 2003). For example, when a Pennsylvania court considers an insurance contract, it does not only evaluate it for ambiguity, but also considers "the reasonable expectation of the insured." Betz v. Erie Ins. Exchange, 957 A. 2d 1244, 1253 (Pa. Super. 2008). Such an evaluation is not limited to situations where the contract is ambiguous. Betz, 957 A. 2d at 1253.

There is no dispute between the parties that the loss suffered by the Jugans falls within the Policy's affirmative grant of coverage. However, defendant argues, citing the conclusions of its expert, Mr. Fleishman, that plaintiffs' claim for the damage to their home is barred by the Absolute Freezing Exclusion contained in Coverage A.

Plaintiffs contend that defendant has not established that the Absolute Freezing Exclusion applies because its expert, Mr. Fleishman, "never gave his own opinion on what if anything caused the [dishwasher solenoid] valve to fail." (ECF 19, p.5.)  To the contrary, Mr. Fleishman specifically states in his report that "[t]he failure of the dishwasher solenoid valve was from

water freezing in the water supply line to the dishwasher." (ECF 12-9.)

Plaintiffs, on the other hand, have not provided <u>any</u> evidence, expert or otherwise, to support an alternate theory. Plaintiff's mere denial that the dishwasher solenoid valve failed, without more, is insufficient to raise a disputed issue of material fact as to whether the Absolute Freezing Exclusion applies. Since it is undisputed that Mr. Jugan did not shut off the water supply nor drain the plumbing or appliances of water before he left the house on February 1, 2015, the sole question then is whether the Jugans used "reasonable care to maintain heat" so as to overcome the Absolute Freezing Exclusion. The burden of showing that they used reasonable care to maintain heat is on the plaintiffs.

In claiming they exercised reasonable care to maintain heat, the Jugans rely heavily on the portion of Mr. Jugan's affidavit wherein he avers that when he had traveled away from the home during similar cold conditions, it was his habit to leave the basement thermostat at the low setting, the main floor thermostat at 62 degrees and, as a result, had never experienced the freezing of any pipes in his home. (ECF 16-1, ¶¶ 23-25, 31, 34.)

The problem with this argument is that it does not take into account the particularly frigid cold spell that it is undisputed occurred in the Fleetwood area from February 15, 2015 to February 20, 2015, the time during which the pipes supplying the dishwasher apparently froze. During this period, the temperature never rose above 29 degrees Fahrenheit and dipped to as low as -1degreee Fahrenheit on two occasions. (ECF 12-9.) Thus, the fact that the pipes did not freeze on prior cold occasions is not probative as to whether it was reasonable for Mr. Jugan to believe that the pipes would not freeze under the extremely cold conditions that occurred in February, 2015.

The parties stipulated that Mr. Jugan acknowledged that the temperature in Massachusetts

17

between February 1, 2015 and March 13, 2015 reached below zero. (ECF 12-5, ¶ 52.) The parties also stipulated that while he was in Massachusetts, Mr. Jugan watched weather reports for the area in which the house was located. (ECF 12-5, ¶ 53.) The parties stipulated that Mr. Jugan understood that the weather in Pennsylvania was "cold and snowy" just like it was in Massachusetts. (ECF 12-5, ¶ 54.)

Even more important, the parties stipulated that Mr. Jugan testified that his neighbors in Fleetwood had access to a key to the house and that Mr. Jugan had the phone numbers of the neighbors and could call them to ask them to check on the house. (ECF 12-5, ¶¶ 55-56.) The parties stipulated that Mr. Jugan even had his neighbors check on the house in the past while he was away. (ECF 12-5, ¶ 57.)

Yet, Mr. Jugan testified that he did not call his neighbors to check on the house or reset the thermostat during the particularly frigid cold spell from February 15, 2016 to February 20, 2016. (ECF 12-7, p. 102.) Moreover, even though Mr. Jugan averred that it was his habit to set the main floor thermostat at 62 degrees and the basement thermostat at the low setting, Mr. Jugan testified that he could not recall if he had actually made these settings when he was at the house on February 1, 2015.(ECF 12-5, ¶¶ 47-50, 65.)

Mr. Jugan could have reset the thermostats when he stopped at the house on February 1, 2015, even though he averred that the heat in the main level of the house was on and that the house felt warm. He did not. He also could have stopped at the house on February 13, 2015, just days before the frigid cold spell began, to reset the thermostats. Again, he did not.

In addition, the parties stipulated to the fact that Mr. Jugan never tested the new radiators that had been installed in the basement in the Summer or 2014 to ensure they were not leaking prior to the loss. (ECF 12-5, ¶ 37.) Certainly, a reasonable homeowner would have wanted to

check to make sure that the radiators worked before he went away in the winter even if the homeowner, like Mr. Jugan, had never experienced any problems in the past.

Even construing the evidence in the light most favorable to plaintiffs, the Court finds that the plaintiffs have not met their burden of establishing facts from which a jury could conclude that plaintiffs used reasonable care to maintain heat in the house. As a result, the exception to the Absolute Freezing Exclusion does not apply and the Absolute Freezing Exclusion precludes plaintiffs from recovering the damage to their home under Coverage A.

Turning to plaintiffs' claim under Coverage C for damage to certain contents in their home, the Court notes that the Coverage C Occupancy Exclusion provides that "[w]e do not pay for loss on the residence premises while the dwelling is unoccupied, unless you have used reasonable care to maintain heat in the building or have shut off the water supply or drained the water from all plumbing and appliances." (ECF 12-5, ¶ 2.) The parties have stipulated that the Policy does not define the term "unoccupied." (ECF 12-5, ¶ 3.) Nor does the Policy prescribe a specific number of days of unoccupancy beyond which the occupancy requirement could not be satisfied.

Interestingly, in other provisions of the Policy, defendant contractually precludes coverage in certain instances unless the individual "has been there at any time during the 45 days immediately preceding the loss." (ECF 12-6, p. 21.)   In another section of the Policy, defendant excludes coverage in certain instances "if the dwelling was vacant for more than 30 consecutive days immediately prior to the loss."(Id.)

Since the term "unoccupied" is not defined in the Policy, the Court must look to other sources. In Kinneer v. Southwestern Mut. Fire Ass'n, 179 A. 800, 802 (Pa. Super. 1935), aff'd sub nom., 185 A. 194 (Pa. 1936), the Superior Court of Pennsylvania held that the term

"occupied" is to be "construed with reference to the nature and character of the building, the purpose for which it is designed, and the uses contemplated by the parties as expressed in the contract. A dwelling house being designed as the abode of mankind, is occupied when human beings habitually reside in it, and unoccupied when no one lives or dwells in it." See also  44 Am.Jur. 2d Insurance  1220 (1982). (A house is unoccupied "when it has ceased to be a customary place of habitation or abode, and no one is living or residing in it.");Couch on Insurance, § 94:127 ("A dwelling is "unoccupied" when it has ceased to be used as a customary place of habitation for any considerable length of time. In other words, a dwelling house is "unoccupied" when it is not used as a residence—when it is no longer used for the accustomed and ordinary purpose of a dwelling or place of abode or when it is not the place of usual return and habitual stoppage. A dwelling is "unoccupied" where the insured has removed from the premises with the intention of taking up another abode despite the fact that he or she revisited the premises once or twice a week. Likewise, a dwelling house is "unoccupied" where the tenant removes to another farm a considerable distance away, leaving only a few small articles of furniture in the insured building, and making only occasional visits to the same.")

There is also an exception to the "habitually residing" test:

There is no breach of a vacancy or unoccupancy provision by a vacancy which is temporary and reasonable under the circumstances. Accordingly, a mere temporary vacancy or absence of the owner, tenant or occupant, or a temporary period of nonuse, which is reasonable in view of the contemplated uses of the property and of all the circumstances, and which is evidenced by some act or acts fairly showing not only an intent to return, but also an intent not to vacate or give up occupancy or use of the premises, or to abandon them for the purposes of their use, will not of itself  operate as a breach of a condition as to vacancy or nonoccupation, even though the same act may have been commenced, which, when completed , will constitute such a vacancy or nonoccupancy. But this general rule must be governed by the wording of the particular condition or conditions of the policy, the character of the occupancy as well as that of the premises insured, or of the purposes for which they were intended to be used, having also in view the object to be accomplished and the degree of protection to be effected or

necessitated by the particular condition or conditions involved and applicable, and by the insurance of the property.

Couch on Insurance § 94:118.

With these definitions in mind, the Court finds that the issue of whether Mr. Jugan's dwelling was "unoccupied" at the time of the loss under the terms of the Policy is a question for the jury. The parties stipulated that: (1) Mrs. Jugan moved to Massachusetts in 2009 and did not live in the house after that time (ECF 12-5, ¶ 24); (2) Mr. Jugan often traveled to Massachusetts after 2009 to visit his wife and children (ECF 12-5, ¶25.); (3) Between 2009 and 2013, Mr. Jugan would travel to New Jersey for several days to assist his mother almost every time his mother underwent chemotherapy (ECF 12-5, ¶ 28.); (4) Between the times he assisted his mother in New Jersey, Mr. Jugan traveled to Massachusetts for several days at a time (ECF 12-5, ¶ 29.); (5) Mr. Jugan was away from the house for as long as "a few weeks, couple of weeks" at a time during the period between 2009 and 2013(ECF 12-5, ¶ 30.); (6) During Summer 2014, Mr. Jugan listed the house for sale (ECF 12-5, ¶ 31.); (7) Certain personal items were recovered from the house while the house was for sale. (ECF 12-5, ¶ 32.); (8) Mr. Jugan's plan to sell the house during Summer 2014 was interrupted by his mother's urgent medical condition. (ECF 12-5, ¶ 38.);(9) Between January 1, 2015 and February 1, 2015, Mr. Jugan spent approximately three to five days in the house, and spent the remainder of his time in New Jersey and Massachusetts  (ECF 12-5, ¶ 42.); (10) The last time Mr. Jugan was in the house before the loss was February 1, 2015 (ECF 12-5, ¶ 43.); (11) On February 1, 2015, Mr. Jugan went to the house for 1-2 hours (ECF 12-5, ¶44.); (12) The sole purpose of Mr. Jugan's visit to the house on February 1, 2015 was to find leftover prescription pain medication because his regular prescription was interrupted.(ECF 12-5, ¶ 45.);  (13) Mr. and Mrs. Jugan made a one-day trip to Pennsylvania on February 13, 2015

21

to obtain Mr. Jugan's renewed prescription (ECF 12-5, ¶ 58.); (14) During the February 13, 2015 trip, Mr. and Mrs. Jugan did not stop at the house.(ECF 12-5, ¶ 59.)

Mr. Jugan testified that for most of December 2013 through April 2014, he stayed with his wife and family in Massachusetts. (ECF 12-7, pp. 16-18.)  Mr. Jugan also testified that he lived in the house from April 2014 until October 2014. (Id. at 18.) Mr. Jugan also testified that he did not know if he still intended to sell the home. (Id. at 115.) He admitted that it was still a possibility that he would move in with his wife in Massachusetts. (Id. at 116.)

In addition, Mr. Jugan still owns the house, has never relinquished possession of it and has unlimited access to the house.

These facts are sufficient to raise a question as to whether the house was "unoccupied" at the time of the Loss. If the jury concludes that the house was not "unoccupied" at the time of the loss, the occupancy exclusion will not apply and plaintiffs would be entitled to recover the value of their contents under Coverage C. If, however, the jury were to find that the house was "unoccupied", the burden would shift to plaintiffs to show that they used reasonable care to maintain heat in the house. Since the Court has already concluded that plaintiffs did not use reasonable care to maintain heat, the exclusion would apply and plaintiff could not recover the value of their contents under Coverage C of the Policy.

For the foregoing reasons, defendant's motion for summary judgment is granted on plaintiffs' claim under Coverage A of the Policy, but denied as to plaintiffs' claim under Coverage C of the Policy.